POPE v. CANTWELL.

SAME v. CANTWELL et al.

(District Court, D. Massachusetts. July 12, 1913.)

Nos. 312, 313.

1. FRAUDULENT CONVEYANCES (§ 104*)—ELEMENTS OF FRAUD AS TO CREDITORS —INTENT.

The voluntary transfer of any interest in property by a husband to his wife when he is actually insolvent is fraudulent and void as to his creditors under the law of Massachusetts, although not made with intent to escape the payment of any particular debt or debts.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 337–344; Dec. Dig. § 104.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. BANKRUPTCY (§ 303*)—ACTION BY TRUSTEE TO RECOVER PROPERTY FROM BANKRUPT'S WIFE—BURDEN OF PROOF.**

Where a general course of business was shown on the part of a bankrupt, who was a builder, extending over several years and while he was insolvent, to build upon property acquired in the name of his wife and then sell the same, the proceeds being reinvested in the same manner, the burden rests upon the wife, in a suit by his trustee to recover property so standing in her name at the time of the bankruptcy, and in the improvement of which some of his indebtedness scheduled was incurred, to show how much, if any, interest in the property belonged to her.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

**3. BANKRUPTCY (§ 303*)—ACTION BY TRUSTEE TO RECOVER PROPERTY—VOIDABLE TRANSFER.**

Evidence considered, in a suit by a trustee in bankruptcy to recover property, and *held* to show that a brother of the bankrupt's wife, who purchased the property, then standing in her name, a few days prior to the filing of the voluntary petition in bankruptcy, was chargeable with notice that the conveyance was made in contemplation of bankruptcy, and for the purpose of placing the property beyond the reach of the bankrupt's creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. § 303.*]

In Equity. Suits by Benjamin Pope, trustee in bankruptcy of Patrick J. Cantwell, against Sarah M. Cantwell, and against Sarah M. Cantwell and Bennett A. Ford. Decrees for complainant.

In Case No. 312:

Nason & Proctor, of Boston, Mass., for complainant.

Lee M. Friedman and Henry I. Morrison, both of Boston, Mass., for respondent.

In Case No. 313:

Nason & Proctor, of Boston, Mass., for complainant.

E. Philip Finn, of Boston, Mass., for respondent Ford.

Henry I. Morrison, of Boston, Mass., for respondent Cantwell.

DODGE, Circuit Judge. Patrick J. Cantwell, of Brookline, a builder, was adjudged bankrupt in this court on his own petition November 28, 1911. His schedules showed liabilities of more than $10,000 against assets of about $4,000, no part whereof was in tangible property; the whole consisting of claims now in litigation in the Massachusetts courts.

The defendant Sarah M. Cantwell is the bankrupt's wife, to whom he has been married since 1894. By deed dated November 1, 1909, John C. L. Dowling conveyed to her a parcel of land on St. Paul street, Brookline, containing, according to the deed, 11,730 square feet. The consideration named was $1, etc., and the land was recited to be subject to a mortgage of $2,000.

The actual transaction was in part an exchange. By deed of the same date there was conveyed to Dowling a parcel of land said to contain 6,107 square feet, with a house thereon, on Kent street, in Brookline, standing in Mrs. Cantwell's name. The deed, executed by her, recited that the conveyance was in her right, and the bankrupt

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

joined in it for the stated purpose of releasing his interest. The consideration named in it was $1, etc., and the property was recited to be subject to a mortgage for $6,500. Dowling also paid Mrs. Cantwell $2,300 in cash.

The land thus conveyed to Mrs. Cantwell was thereafter surveyed into two lots, hereinafter referred to as A and B. Upon lot A, containing about 6,5   feet and having a frontage of 69 feet on St. Paul street, Mrs. Cantwell gave a construction loan mortgage, recited to be in her right, to W. W. Babcock, under date of May 15, 1911; the bankrupt joining as in the above deed of the Kent street property. Upon this lot there was thereafter erected a six-apartment house; the bankrupt being the architect and builder It was completed about November 1, 1911, four weeks before his bankruptcy. Of his debts as scheduled, some part—how much is left uncertain—was incurred while he was constructing this building. The second of the above suits is concerned with lot A and this building thereon, as will below appear. The mortgage of $2,000 on both lots, to which the conveyance received by her was subject, was paid off and discharged September 10, 1911.

Lot B still stands in Mrs. Cantwell's name. It contains about 5,159 square feet, is in the rear of lot A, and is connected with St. Paul street by a 10-foot passageway at the side of and over lot A. With this lot the first of the above suits is concerned.

The plaintiff is the trustee of Cantwell's estate in the bankruptcy proceedings above mentioned, being the case numbered 17,715 on the bankruptcy docket of this court. His bill in the first case is brought against Mrs. Cantwell only. In it he alleges that the bankrupt caused lot B to be conveyed to his wife in contemplation of bankruptcy; that the consideration for the conveyance was the bankrupt's property, not his wife's; that she furnished no part of the consideration; that in causing the title to be put in her name he acted with intent to hinder, delay, and defraud his creditors; that he thereafter incurred further debts in contemplation of bankruptcy; that she took the title with intent to assist the bankrupt's fraudulent purpose and to hold the title for his benefit, under the fraudulent appearance and claim, as to all others, of absolute ownership in herself; also that the bankrupt caused the conveyance to be made to her while himself insolvent and contemplating bankruptcy, with the view of preventing the property from coming to his trustee, and thus prevent its administration under the Bankruptcy Act for his creditors' benefit, and that she had reasonable cause to believe him insolvent and contemplating bankruptcy at the time. The bill alleges, further, that she was about to transfer the property to an innocent purchaser for value. It asks that the above deed of November 1, 1909, from Dowling, under which she holds the property, be declared void, and a conveyance of it to the plaintiff as assets of the estate be ordered, and that meanwhile any transfer or incumbrance of the land be restrained. An injunction ad interim has issued.

Dowling, who made the transfer which the plaintiff seeks to "avoid," is neither charged with any fraud nor is he made a party. It is not

claimed that the property he transferred was the bankrupt's, in any sense, at the time. The case, therefore, is not the ordinary suit by a bankruptcy trustee under section 70e of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 565, 566 [U. S. Comp. St. 1901, p. 3452]). It is not sought to avoid the transfer as to the grantor but to treat the grantee as holding it under a conveyance lawful so far as the grantor was concerned, but for her husband the bankrupt, instead of for herself, and to obtain a conveyance accordingly from her.

Mrs. Cantwell, in her answer to the bill, denies all its allegations of fraud or fraudulent intent and of knowledge thereof, or cause to believe, on her part, that there was any such fraud or fraudulent intent; and she alleges that the property conveyed was at all times hers, paid for by her, and not by her husband, and never his property, either legally or equitably.

The plaintiff contends, and the defendant denies, that this Kent street property, transferred to Dowling subject to a mortgage for $6,500 in exchange for the St Paul street land, whereof lot B is part, was really the bankrupt's. It stood in his wife's name, and she testified that she paid about $4,800 of her own money for it and another lot on Kent street below referred to. The bankrupt testified that it belonged to her But these statements must be considered in connection with the following facts which appear from the evidence:

The deed under which Mrs. Cantwell held this Kent street lot was from the trustees of the Aspinwall estate, dated March 25 and recorded March 26, 1902. It ran to her, and, so far as it showed, the lot was then unincumbered, save for certain restrictions. The same trustees had previously given another deed to her, dated November 1 and recorded December 26, 1901, of an adjoining lot on Kent street, containing 6,175 feet. This lot she had mortgaged to one Graffam for $6,000; the deed being dated December 12 and recorded December 26, 1901. By deed dated March 25 and recorded March 26, 1902, she had mortgaged both lots to Graffam for $1,500. By deed dated October 1 and recorded November 5, 1902, she had mortgaged both lots to Graffam for $7,000; and by deed dated November 21 and recorded November 24, 1902, she had mortgaged both lots to the Curtis & Pope Lumber Company for $1,200.

Each of the above mortgages was expressed to be in her right, and in each her husband had joined. The mortgage for $6,000 on the first lot acquired was not expressed to be subject to any prior mortgage. That for $1,500 on both lots was made subject to the $6,000 mortgage. That for $7,000 on both lots was not expressed to be subject to any prior mortgage. That for $1,200 was made subject to the mortgage for $7,000. Before the exchange for the St. Paul street property all these mortgages, except that for $7,000, had been discharged, and a partial release from that had been given.

Upon each of the Kent street lots a three-apartment house had been built during 1902. The bankrupt was the builder. By deed dated August 1, 1907, Mrs. Cantwell conveyed the lot transferred by the trustee deed to her of November 1, 1901, with the house since built on it, to Ellen Shanahan, for what price does not appear, free from

incumbrances. The Graffam mortgages for $6,000 and $1,500, also the Curtis, etc., Company mortgage for $1,200, were discharged, and this lot released from the $7,000 mortgage. The remaining house on Kent street, on the lot covered by the trustees' deed of March 25, 1902, continued to stand in her name until conveyed by her as above in exchange for the St. Paul street property, subject to a mortgage for $6,500, presumably the Graffam mortgage, given originally for $7,000, less a payment for partial release. The Curtis & Pope mortgage she claims to have paid off.

The testimony of the bankrupt and of his wife was that he agreed with her to build the two Kent street houses on the above lots standing in her name for $14,500, being the total amount of the three mortgages to Graffam—these being "construction loan" mortgages. If there was such an agreement, there is nothing but their testimony to prove it. It is not claimed to have been anything but an oral agreement, nor is anything in writing produced to show that it was ever carried out as made. It is not shown to have been based on any written specifications. Although he had then been carrying on building operations, sometimes involving considerable amounts, since before his marriage in 1894, and continued to do so until his bankruptcy in November, 1911, the bankrupt never kept any books. Nor, although his wife had similar transactions with him, both before and after this one, also involving considerable amounts, did she ever keep any books, or take from him any written receipts or accounts, showing what money raised on property in her name went into his hands or what he had done with it.

According to the testimony of both, while building the Kent street houses, he got money, under her authority, from time to time, from Graffam to the full amount called for by the Graffam mortgages, expending what he got as he saw fit, and without ever rendering any account of it to any one. It does not appear that she ordered any of the work or materials; these were furnished as he ordered them. They were not billed to her, but to him. The mortgage of $1,200 to the Curtis & Pope Company was given to secure a debt contracted by him, not by her, in connection with what particular building operation does not appear. If it was for lumber which went into the Kent street house, then their cost to build was that much, at least, in excess of the alleged contract price, and there is other evidence tending to show that in building them no particular regard to any definite contract price was had. Although Mrs. Cantwell testified that she was "frightened" into executing this mortgage by the mortgagee or its representatives, I am unable to find that she manifested any particular reluctance to execute it, after the bankrupt had told her that the company wanted it, or that there was any remonstrance by him; and the fact that in 1898 she had executed two mortgages to the same concern on property standing in her name, under similar circumstances, also without remonstrance on his part, prevents me from believing that she gave this mortgage otherwise than voluntarily, and as a matter of course, because the exigencies of her husband's business required it. The fact that she so gave it is, to my mind, a strong

indication that there had been nothing that could in any sense be called a "contract" between her and her husband for the building of the houses. It is not claimed that she ever undertook to do business on her separate account. Except so far as it can be distinctly shown to have been an investment of her money, I must regard the enterprise as her husband's, carried on to suit his purposes, though on land standing in her name. It cannot be discovered from the evidence that anything, or how much, if anything, went to him as profit or compensation out of the transaction; if it was nothing, then his activities added value (it not appearing that the completed houses were worth less than the money invested) to property standing in his wife's name.

Though they stood in her name, the evidence relied on to prove that the Kent street lots represented an investment of money belonging to Mrs. Cantwell only must be regarded as by no means sufficient for that purpose. Her testimony that she paid "about $4,800" for the two lots has been referred to. She also testified that she got $2,400, paid for the first lot, from rents of her property at 31 Perry street, Brookline. She indicated no other source from which she could have got about the same amount to pay for the second lot, bought three or four months later. The lot at 31 Perry street she had held under a deed to her from the same trustees, dated February 26 and recorded March 19, 1897. Upon it, in 1898, the bankrupt had built an apartment house, also under an alleged oral contract with her to build it for $4,500, and during its construction the proceeds of a mortgage for that amount, given November 11 and recorded November 12, 1897, in her right, her husband joining, had gone into his hands. In all essential features, the evidence regarding the carrying out of this enterprise is similar to that regarding the Kent street enterprise, and it leads to the same conclusion; i. e., that it was not an enterprise conducted wholly for her benefit, by her husband, under a definite understanding with her, but was really his enterprise, protected by the fact that the record title was in her. This house was sold March 31, 1906; one apartment having been occupied by the bankrupt and his wife since its completion. It is said to have been sold for $7,500, subject to the above mortgage for $4,500, and a later mortgage to the Curtis & Pope Company for $700. There is no evidence of any accounting between her and the bankrupt with regard to the proceeds. She says they were disposed of as follows: Another Perry street lot (No. 58) was conveyed to her August 1, 1906. For this, with an apartment house on it, free from incumbrance, she says she paid $7,775, using $1,775, accumulated from rents and proceeds of the sale of 31 Perry street, and giving a mortgage on 58 Perry street for $6,000. The property stood in her name until after her husband's bankruptcy, when she gave a deed of it (February 15, 1912), subject to the $6,000 mortgage, for $10,200. The money received ($4,200) she had at home, in bills, at the time of her examination in April, 1912. This testimony, unsupported as it is by any contemporaneous accounts, memoranda, or vouchers, I am unable to accept as stating the whole truth, nor can I believe that when she bought the Kent street lots she could have had $4,800 in rents received from

.31 Perry street wherewith to pay for them. The conclusion strongly indicated is that some of this money, at least, came from her husband's other building operations. In these operations, some of them on land in her name and some not, he appears, at all times before his bankruptcy, when money or stock was needed, to have used what was most available at the moment. There is no proof at all of any pains taken by him, at any time, to keep what went into one distinct and separate from what went into another.

This conclusion seems to me further supported by testimony from the agent of the trustees, who conveyed the two Kent street lots to Mrs. Cantwell in November, 1901, and March, 1902. According to him, though Mrs. Cantwell testified that she saw him and talked with him about the price of the lots, and decided to buy them only "partly" on her husband's advice, his negotiations about them were with the bankrupt himself, who told him that he wanted to buy them, had three or four interviews with him about buying them, agreed in his own name to buy them, and made no mention of Mrs. Cantwell's name in connection with them, though he afterward had the deed made to her as grantee. There was similar testimony from a broker who conducted negotiations for the previous purchase of 31 Perry street in 1897.

For this lot at 31 Perry street Mrs. Cantwell claims to have paid $1,200 in 1897, out of $2,000 she had when married in 1894. She claims to have kept it on hand, in bills, during the intervening period. There is nothing but mere statements by herself or by her husband to prove that this was the fact; but, conceding its truth, I am still unable to conclude that nothing belonging to her husband went into the Perry street property, sold for $2,300 above mortgages in March, 1906, or into the Kent street property, sold for an unnamed price in August, 1907, or into the other Kent street property, exchanged in 1909 for the land on St. Paul street, with which we are immediately concerned in this case.

The bankrupt testified that he had never represented any property standing in his wife's name to be his, and she testified that she had never heard him do so, or known of his doing so. I do not find any sufficient contradiction of this evidence. But it does appear that, while Mrs. Cantwell held the Kent street property, the bankrupt, in answer to inquiries of him, made in May and October, 1904, by a representative of the Building Trades Credit Agency, of Boston, stated, as matters among those affecting his financial standing, particulars regarding various pieces of real estate, among them the Kent street houses, one or both of them, with the statement however that they stood in his wife's name. Similar statements were made by him to a representative of the same agency in June, 1908. And later, in June, 1911, he again made similar statements to a representative of the same concern, although, this being after the transfer of both Kent street houses, the St. Paul street property was then mentioned instead. The defendant moved to strike out the evidence of the witnesses here referred to (Ells, Richardson, and Emerson), as incompetent against Mrs. Cantwell. This motion is denied, although I have not drawn

from their evidence the conclusion that the bankrupt told either of the witnesses referred to that the property was his.

[1] The statements made as above to the Building Trades Credit Agency indicate, what clearly appears also from the bankrupt's own evidence, that at no time prior to his bankruptcy did he have property standing in his own name to any substantial amount. He built nothing, from first to last, upon land standing in his own name. He never had any bank account of his own, but settled bills against him, whenever he did so, with money carried about with him. His assets were uniformly less than his liabilities. In incurring bills connected with his building operations, therefore, he was constantly incurring liabilities which he had reasonable ground to believe that he might not be able to pay, independently of the property transferred from time to time to his wife. The transfer to her of anything in which he was interested would, under such circumstances, be fraudulent and void as to creditors, even if not made with intent to escape payment of any particular debt or debts. Mowry v. Reed, 187 Mass. 174, 177, 72 N. E. 936.

The plaintiff contends that the evidence discloses a definite scheme on his part, to which his wife was a party, to build up equities in her name with the intention of defrauding his creditors. While I am not prepared to find an actual intent proved to defraud the particular creditors claiming his estate in these proceedings, or any particular creditors, or to find that he incurred liabilities with the distinct intent to go into bankruptcy when he did, or at any time, the evidence as a whole, including that relating to transactions prior to those mentioned above and to later dealings with regard to the St. Paul street property, shows a course of dealings followed by him while insolvent, the natural and probable result of which would be to accumulate property in his wife's name, which, at least in part, in case of his bankruptcy at any time, ought to have gone to his then creditors. And as Mrs. Cantwell participated in this course of dealing with full opportunity to know, if she did so without inquiry, she is so far chargeable with knowledge of these features of his course of dealing that her acquiescence amounts to co-operation in it.

[2] On her behalf it is insisted that the plaintiff has the entire burden of proving that what was conveyed in exchange for the St. Paul street land belonged to the defendant's husband. Under the circumstances shown, I think the burden is upon her, if she claims that it, or any part of it, was hers, to show how much, if any, belonged to her.

In Seitz v. Mitchell, 94 U. S. 580, 582 (24 L. Ed. 179), it is said:

"Purchases of either real or personal property made by the wife of an insolvent debtor during coverture are justly regarded with suspicion, unless it clearly appears that the consideration was paid out of her separate estate. Such is the community of interest between husband and wife, such purchases are so often made a cover for a debtor's property, and are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny. In a contest between the creditors of the husband and the wife there is, and there should be, a presumption against her which she must overcome by affirmative proof. Such has always been the rule of common law; and the rule continues, though

statutes have modified the doctrine that gave to the husband absolutely the personal property of the wife in possession, and the right to reduce into his possession and ownership all her choses in action."

I think the creditors represented by the plaintiff, against whom Mrs. Cantwell has failed to overcome the above presumption against her and to make it clearly appear that the consideration for the St. Paul street land came out of her separate estate, are entitled on the above principles to avoid the transfer, and to have reconveyed to the plaintiffs for their benefit so much of that land as she now holds—in other words, lot B. Especially does this seem to me the just conclusion in view of the fact that a principal reason for her failure to show with whose funds the properties standing in her name were acquired is the entire failure through a series of years, on the bankrupt's part and on hers, to keep any accounts or records of transactions in their nature such as to make proper accounts indispensable to assure her husband's creditors that his dealings with her were honest as to them. Their testimony, given in the present case, has seemed to me calculated rather to take advantage of the absence of any such accounts than to do everything in their power to supply the want.

This result would dispose of the second suit, relating to lot A, but for its alleged transfer to the other defendant therein, Ford. It remains to inquire whether or not his defense, that he bought this lot of Mrs. Cantwell in good faith and for an adequate consideration, is established. A temporary injunction has issued in this case as in the first.

[3] As has been stated, the bankrupt proceeded in 1911 to build a six-apartment house on lot A, incurring in its construction some of his scheduled debts. The operation was conducted in a manner similar to that followed in the previous similar transaction. He ordered materials and labor, which were billed to him. She claims to have given him $1,000, apparently from the $2,300 paid her in the exchange by Dowling. Under her authority, he got from Babcock the amount of the construction loan mortgage dated May 15, 1911, $13,-000. Both of them say that he made an "oral contract" with her to construct the building for $14,000. The building having been completed about November 1st, all liens thereon having been waived, and the mortgage for $2,000 on the land when Dowling conveyed it paid off September 10th, as above stated, she gave a permanent mortgage on November 6, 1911, for $13,000 to the Home Savings Bank. The mortgage to Babcock was then assigned to the bank. The mortgage to the bank was "in her right," her husband joining; but the application for it, dated October 26, 1911, was signed by the bankrupt alone, without mention of her. In this application he gave the estimated value of the land (lot A) as $4,000, of the building $20,000, and he asked in it for a loan for $15,000. The mortgage taken by the bank for $13,000, dated November 6th, was recorded on the same day at 11:50 a. m.

During the construction of this building, the bankrupt had also been engaged in building another house on Brook street, upon premises owned by one Halloran, not far off. The amount of his contract for

this building is said to have been nearly $9,000. He never completed it, but went into bankruptcy after having received $6,000 on account, $3,000 or $4,000 whereof he used, according to his testimony, to pay off old debts. During the same period, and from a time preceding the building of the Kent street houses, it is claimed by the bankrupt and by his wife that he paid to her an average allowance of $30 a week for household expenses, besides from time to time paying other living expenses of his family.

The bankrupt, though he produced some bills and vouchers, or other papers, relating to his building operations during 1911, failed for the same reasons as above to show with any exactness what the actual cost of building the St. Paul street house was. Upon all the evidence tending to show the amount of its probable cost, together with the evidence relating to its value when completed, with the land on which it stood, I think the conclusion is warranted that the amount expended in its construction considerably exceeded $14,000, testified to have been the agreed amount. The evidence shows, further, that a not inconsiderable part of the material which went into it was of quality distinctly better than would ordinarily go into a $14,000 building of that size. It appears, also, that the bankrupt put into it some material which he had ordered for the house he was building on Brook street. Even on the assumption that lot A and the $14,000 were wholly Mrs. Cantwell's separate property, I should be unable to find it proved that no property which his creditors would have a right to call her husband's property went into this house.

The defendant Ford took a deed of the property from Mrs. Cantwell, her husband joining, dated November 4, 1911, and recorded November 6, 1911, but some hours after the record of the bank mortgage on the same day. The consideration named in the deed was $1, etc., and it was made subject to "a first mortgage" for $13,000. The certificate upon it shows it to have been acknowledged by both grantors on November 4th.

Ford is Mrs. Cantwell's brother. He then lived in Chelsea, with two other sisters and their mother. He had carried on a grocery business in Chelsea in conjunction with one of these sisters for about 10 years. He testified that the actual consideration given by him for the deed dated November 4th was $2,000 in money, paid by him to Mrs. Cantwell on the morning of November 6th, and a so-called note for $2,500, given to her at the same time. The "note" was offered in evidence and is as follows:

"Brookline, Nov. 6, 1911.

"In consideration of purchase of a lot of land designated on plan as [lot A] with building thereon numbered 43 and 45 St. Paul street, Brookline, Massachusetts, Co. of Norfolk, I hereby promise to pay unto the said Sarah M. Cantwell, or order, twenty five hundred dollars in three years from date, with interest at the rate of six (6) per cent., to be paid semiannually, providing all plumbing, electric lighting, gas and gas ranges, heating apparatus, and window screens, which is as agreed on or described in a first-class condition; if not, the purchaser can hold back a reasonable amount of money to make satisfactory any defects which may arise six months from the above date.

"[Signature]    Bennet A. Ford. [Seal.]
"Witness by Joseph Foster. [Seal.]"

The words "signature" and "witness by" are in the same handwriting as the body of the document.

Upon all the evidence relating to the question, I think $17,500 less than the fair market value of the property and $4,500 less than a fair market value of the equity in it, on November 6, 1911. It can hardly be said, however, that these values are proved to have been so much below the true values as of themselves to justify avoiding the transfer merely because of inadequacy in the consideration. But if $4,500 be regarded as the value of the equity, $2,000 was a grossly inadequate price for it, and such a promise to pay as the above, made as this was between brother and sister and unsecured, cannot be regarded as the equivalent of $2,500 in money, where creditors' rights are concerned. In view of all the evidence relating to Ford's responsibility, there is difficulty in assigning to this "note" any substantial value.

Not only was Ford Mrs. Cantwell's brother, and partner in business with one of her sisters, but he had known the bankrupt for 20 years, according to the latter's testimony, and they were intimate friends. On his own statement he knew the bankrupt had no property "from the time they owned the Kent street property, also the Perry street property," and he had often heard Mrs. Cantwell speak of this. She first spoke to him about buying the St. Paul street property, telling him she needed the money and had to sell it. He had never had business transactions with her before, nor had he made any previous purchase of real estate.

The bill in the second suit charges Ford with reasonable cause to believe Cantwell insolvent and acting in contemplation of bankruptcy, and with accepting and taking title to lot A with the intent of holding it for Cantwell's benefit under the fraudulent appearance and claim, as to all save him and his wife, of absolute ownership These allegations he denies, neither admitting nor denying allegations of fraud regarding claim to the property on the part of Mrs. Cantwell and of the bankrupt similar to those made in the first suit.

The conveyance to Ford was not only a transaction between brother and sister, but was out of the ordinary course of business, and for a consideration unusual in character and inadequate. These features of the transaction are enough in themselves to subject it to strong suspicion, and to throw upon him the burden of proving the absence of any reason on his part to know those conditions under which she held the property which I have regarded as making its transfer by her inequitable as to her husband's creditors. Ford's relationship with her and his intimate friendship with her husband prevent him, under such circumstances, from saying that he was without opportunity to know the facts regarding the bankrupt's solvency and relation to property standing in his wife's name. If, knowing, as he did, that the bankrupt's building operations had been extensive, that he had had no property of his own while carrying them on, and that all property acquired in the course of them had been carried in Mrs. Cantwell's name, he took the transfer from her without inquiry, and upon the assumption, without inquiry, that she had an unqualified right to convey the property, I must consider him chargeable with knowledge,

whether he had actual knowledge or not, of the real situation of affairs.

Not only would these reasons prevent me from sustaining the transfer to him of November 6, 1911, but there is much in the evidence which tends strongly to the conclusion that the whole truth regarding his dealings in the matter with Mrs. Cantwell and the bankrupt has not been told, and that he must have had much more actual knowledge as to their motives in making the transfer than he is willing to admit. According to his testimony, the terms of the transfer were not settled between him and Mrs. Cantwell until Sunday, November 5th; but the deed to him, as has been stated, had been executed and acknowledged by both grantors the day before. According to his testimony, he went, on the morning of Monday, November 6th, from Chelsea to Brookline, with $2,000 in bills, which he there paid over to Mrs. Cantwell, and there signed the "note" which she then drew up, thereafter going with her from Brookline to the Home Savings Bank, in Boston, and taking delivery of the deed to him after the Savings Bank mortgage had been delivered and sent for record. All this makes the transaction appear one still more out of the ordinary course of business. The bankrupt's testimony, which Ford and Mrs. Cantwell both endeavor to support, was that the transaction was a matter of business wholly between Ford and Mrs. Cantwell, with which he had very little to do. The evidence shows, however, that besides being present on November 4th when the deed to Ford was acknowledged, he was present on Sunday, November 5th, while the matter was being discussed, and again present at Brookline on Monday, November 6th, when the $2,000 is said to have been paid Mrs. Cantwell and the "note" prepared and given to her.

It is proper to state that Mrs. Cantwell gave her testimony in my presence, all the remaining evidence being taken out of court and before a stenographer.

I am obliged to hold in both cases that the plaintiff is entitled to a decree in accordance with the prayer of his bill. A decree may be submitted accordingly in each case.